Bergan, J.
On January 2, 1968 plaintiffs and defendant entered into a written contract pursuant to which plaintiffs became for defendant “ its exclusive manufacturer’s representative in the sale of Acousta/G-laze Window Products ” for a described territory.
The provision which is the subject of this action stated: “ Commissions will be paid on the basis of 10% base commission, distributed one-half for a specification and one-quarter each for the order and field service.”
Plaintiffs learned of the projected construction of the World Headquarters for Pepsico Inc. at Harrison. They initiated and took part in the presentation of defendant’s product for use in this building. There were protracted negotiations with the architect and others in which plaintiffs and representatives of the defendant participated and which resulted in acceptance of defendant’s bid for the acoustical glass in the project and the execution of a contract by defendant with the builder, Turner *231 Construction Company, on June 28, 1968. This contract produced a total sale of $590,824.64 of defendant’s product.
It may be fairly said of the record that it shows a sufficient role played by plaintiffs in the finding of a purchaser for a very substantial quantity of defendant’s product and of the initiation and negotiation of conditions leading to the agreement of sale of June 28,1968 to meet any reasonable requirement as to earned commissions usual for a manufacturer’s representative.
Defendant’s proof shows that the term “ for a specification ” is usually understood in the business as persuading an architect to include the prpduct in his plans without necessity of modification of the product. But the term “ for a specification ” in this contract does not spell out the time when acceptance by the architect would be made and if the architect, the builder and the manufacturer are agreed on modification of the product and acceptance of it, it could well be found by the court to be a sufficient ‘ ‘ specification ’ ’ to meet a reasonable reading of the language where the manufacturer’s representative has initiated the arrangement and actively participated in the negotiations. This, too, as to “ field service ”.
Not only did defendant include plaintiffs’ 10% commission in its bid for the job but as to the avoidance of payment of the commission of 10%, the contemporaneous statements and actions of defendant make it clear that the absence of “ specifications” or of “ field service ” played no part whatever in the differences about commissions. The reason for nonpayment was, rather, that since defendant claimed it lost money on the job plaintiffs should share the loss.
In this connection the testimony of Bichard H. McCurdy, executive vice president of defendant, is significant. The bid was submitted April 16, 1968. Before it was submitted Mr. McCurdy had several conversations with Adams, one of the plaintiffs. He testified: “It was my point during this conversation to develop the strategy of approaching our bid on this job.”
His testimony continued: “ We discussed what our approach should be and I stated to Mr. Adams that I felt that our only chance of getting this job was to come in with the lowest possible figure * * *. I also related to Mr. Adams that we were very concerned in that we had not been involved in a job of this *232 size as a material supplier and had never been involved as a subcontractor prior to that, that we both had to work together to get this job and that I would need his full cooperation and flexibility in relationship to his payment for commissions or compensation that we would pay him if we were successful in getting this job.”
There then follows a significant answer (still on direct examination) as to discussion of “ how much of a commission would be paid ’ ’. The answer was ‘ ‘ There was no comment to a specific amount. We discussed only that we would both be flexible and that he would trust us to be fair in deciding what the compensation would be ”. If the job was as profitable as defendant hoped, he added “naturally” we would hope to pay “a full 10 per cent of the total contract price ’ ’.
Quite consistent with this contemporaneous treatment of the specifications and field services provisions of the agreement as being quite irrelevant to the actual dealings of the parties in this large contract is a letter to plaintiffs from Lawrence W. Connelly, president of defendant, on November 22, 1968 answering plaintiffs’ request about “ commission payments ”. It opens: ‘ ‘ Lets establish the following policy, subject to your approval, so that we are all clear and able to plan cash flow in the future ’ ’, and concludes: “ As previously stated, it is our intention to pay the full commission due, with the proviso that we be given the opportunity to discuss this further in the event that the job does not go as we anticipate financially. This statement is intentionally vague so that you will realize that our intentions are surely not designed to reduce your well earned commission on this job.”
At the early stages of the negotiation Mr. Connelly testified that defendant’s strategy was to bid the job extremely low because the company “ had no recognition, we had never done a job like this, and the architect was Edward Durrell Stone, of considerable renown, the contractors, Turner, one of the largest in the country. It was unlikely that they would entertain Site-lines, who had never done a job of any magnitude like this, as a subcontractor for this job, unless there was enticement to do so.”
He continued: “ We indicated to Mr. Adams and Mr. Schroeder that if the job went successfully * * * that we would like *233 to pay them 10 per cent of the price as their compensation for whatever they were going to do to help, and they were extremely cooperative, although they did not do anything specifically per the original agreement that we had.” It seems of significance that Connelly testified that [1] ‘ essentially the reason ’ ’ defendant did not pay “ the full commission ” of 10% to plaintiffs was the ‘[1] financial inability ’ ’ of defendant to pay.
This contemporaneous basis of discussion about commissions must be seen in the light of the defense interposed by defendant in the action and urged in this court: that because plaintiffs did not literally induce the architect to insert defendant’s product without modification into “specifications” and plaintiffs did not render “ field service ”, their commission would be limited to a “ distribution ” of 2%% for getting “ the order ”. It is manifestly clear that this was not part of any of the contemporaneous discussions between plaintiffs and defendant, or their own interpretation as they acted on the contract itself.
Although none of these discussions or correspondence amounted to an unconditional acknowledgement by defendant of the obligation to pay “ a full 10% commission ”, the written agreement had already committed defendant to pay that amount if plaintiffs had performed their part as agents in producing the ultimate sale of the product.
Running through all the transactions, conversations and correspondence between the parties is the acceptance of plaintiffs’ work as a sufficient, and certainly highly productive, performance. Nowhere in the direct transactions between them is there suggestion by defendant that plaintiffs did not perform according to the terms of the contract until that defense was raised in this litigation.
The parties to a contract such as this one resulting in a manner of performance of large importance and potential advantage to the business of defendant could reasonably be deemed to treat as of no importance, and as not defeating plaintiffs’ commission, details such as architect’s specifications or field services. Indeed the architect did ultimately accept defendant’s product with changes and plaintiffs certainly did more in “field services ” than merely get the basic “ order ”.
There can be little doubt as a matter of essential fairness between the parties, plaintiffs should be treated as being entitled *234 to the “ base commission ’ ’, e.g., “ our intentions are surely not designed to reduce your well earned commission on the job
It is possible other and more sophisticated procedural avenues might have been followed in this litigation. Plaintiffs could have alleged specifically practical construction of the contract by both parties to the contract on this particular job entitled them to 10% commission; or they might have disregarded the contract and sued on quantum meruit.
At the end of the trial and on the defendant’s motion to dismiss, its counsel, arguing that the contract was “not applicable ” to “ the Pepsico situation ”, conceded in answer to the question of the Judge that plaintiffs were “ entitled to get paid for their services ” but not on the basis of this contract. He agreed with the Judge’s posed alternative that recovery might be on quantum meruit. It could scarcely be doubted that on such a basis, in view of the size and importance of this sale, the commission would be found worth at least 10% of the sale.
If, however, it is possible to sustain the entirely just result reached at the Appellate Division without beginning all over again the protracted litigated process in which these parties have engaged, this should be done.
The Appellate Division decision may be read broadly to result in a finding that the parties themselves treated the specification and service clauses of the agreement as subordinate and without significance in the Pepsico job; and that there was a sufficient over-all performance by plaintiffs.
There was, the court held, “ on this project ” no requirement or need under the court’s “ interpretation of the contract ’ ’ for “ definitive services by plaintiffs ”. The record fully supports this conclusion. There is certainly no need to remit for further refinement or interpretation the superficially inconsistent statement of the court that ‘ ‘ the reference in the contract was merely to time of payment ”. The result reached is the right one.
The order of the Appellate Division should be affirmed, with costs.

. Minor discrepancies in deriving the several percentages from the gross revenue are due to adjustments not material to the issue.